IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: JOSEPH ZWICHAROWSKI<br>        Debtor, | BANKRUPTCY CASE NUMBER<br>17-11811-MDC |
| NATIONSTAR MORTGAGE LLC<br>        Movant. | CHAPTER 13 |
| v. | 11 U.S.C. § 362 |
| JOSEPH ZWICHAROWSKI<br>        Debtor/Respondent, | HEARING DATE AND TIME:<br>**July 5, 2022 at 10:30 A.M.** |
| KENNETH E. WEST, Trustee<br>        Additional Respondent. | COURTROOM # 2 |

### MOTION OF NATIONSTAR MORTGAGE LLC FOR RELIEF FROM THE AUTOMATIC STAY UNDER SECTION §362 (d)

Secured Creditor, Nationstar Mortgage LLC ("Movant"), by and through its undersigned counsel, pursuant to 11 U.S.C. §362, hereby seeks relief from the automatic stay to exercise and enforce its rights, without limitation, with respect to certain real property. In support of this motion, Movant avers as follows:

1.      Debtor named above filed a Voluntary Petition under Chapter 13 of the United States Bankruptcy Code in the Eastern District of Pennsylvania under the above case number.

2.      Movant is the holder of a secured claim against Debtor, secured only by a first mortgage lien on real estate which is the principal residence of Debtor located at 3982 Carteret Drive, Philadelphia, PA 19114 (the "Mortgaged Premises").

3.      Nationstar Mortgage LLC services the loan on the property referenced in this motion for relief. In the event the automatic stay in this case is modified, this case dismisses and/or the debtor obtains a discharge and a foreclosure action is commenced on the mortgaged property, the foreclosure will be conducted in the name of Nationstar Mortgage LLC.

4.      Nationstar Mortgage LLC, directly or through an agent, has possession of the promissory note. The promissory note is either made payable to Noteholder or has been duly indorsed in blank. Noteholder is the original mortgagee, or beneficiary, or the assignee of the security instrument for the referenced loan.

5.      The filing of the aforesaid Petition operated as an automatic stay under Section 362(a) of the Bankruptcy Code of proceedings by Movant to foreclose on the Mortgaged Premises. Movant requests relief from the automatic stay to continue with the filed

mortgage foreclosure action, if any, and to take the necessary action to obtain the Mortgaged Premises.

6.      Additional Respondent is the Standing Trustee appointed in this Chapter 13 proceeding.

7.      Debtor has not claimed an exemption in the subject property.

8.      Debtor has failed to make all post-petition monthly mortgage payments.

9.      The defaults include the failure to make the following monthly payments:

| | |
|---|---:|
| Payments of $896.53 from May 1, 2022 through June 1, 2022 | $1,793.06 |
| Suspense Balance | ($21.52) |
| The total amount due | $1,771.54 |

10.     The Fair Market Value of the Mortgaged Premises is $157,953.00, as per Debtor Schedules.  The approximate amount necessary to payoff the loan is $144,350.25 good through June 1, 2022.  The breakdown of the payoff is as follows:

| | |
|---|---:|
| Principal Balance | $143,462.31 |
| Accrued Interest | $866.76 |
| Escrow Advance | $42.70 |
| Suspense Balance | ($21.52) |

11.     Movant's interests are being immediately and irreparably harmed.  Movant is entitled to relief, from the automatic stay, pursuant to either 11 U.S.C. § 362 (d)(1) or (d)(2), because of the foregoing default and because:

    a)      Movant lacks adequate protection for its interests in the Mortgaged Premises;

    b)      Debtor has little, if any, equity in the Mortgaged Premises; and

    c)      The Mortgaged Premises are not necessary to an effective reorganization or plan.

12.     Movant requests that the Court waive Rule 4001(a)(3), permitting Movant to immediately implement and enforce the Court's order.

13.     Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase order, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements in support of right to seek a lift of the automatic stay and foreclose if necessary.

mortgage foreclosure action, if any, and to take the necessary action to obtain the Mortgaged Premises.

6.      Additional Respondent is the Standing Trustee appointed in this Chapter 13 proceeding.

7.      Debtor has not claimed an exemption in the subject property.

8.      Debtor has failed to make all post-petition monthly mortgage payments.

9.      The defaults include the failure to make the following monthly payments:

| | |
|---|---|
| Payments of $896.53 from May 1, 2022 through June 1, 2022 | $1,793.06 |
| Suspense Balance | ($21.52) |
| The total amount due | $1,771.54 |

10.     The Fair Market Value of the Mortgaged Premises is $157,953.00, as per Debtor Schedules.  The approximate amount necessary to payoff the loan is $144,350.25 good through June 1, 2022.  The breakdown of the payoff is as follows:

| | |
|---|---|
| Principal Balance | $143,462.31 |
| Accrued Interest | $866.76 |
| Escrow Advance | $42.70 |
| Suspense Balance | ($21.52) |

11.     Movant's interests are being immediately and irreparably harmed.  Movant is entitled to relief, from the automatic stay, pursuant to either 11 U.S.C. § 362 (d)(1) or (d)(2), because of the foregoing default and because:

   a)      Movant lacks adequate protection for its interests in the Mortgaged Premises;

   b)      Debtor has little, if any, equity in the Mortgaged Premises; and

   c)      The Mortgaged Premises are not necessary to an effective reorganization or plan.

12.     Movant requests that the Court waive Rule 4001(a)(3), permitting Movant to immediately implement and enforce the Court's order.

13.     Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase order, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements in support of right to seek a lift of the automatic stay and foreclose if necessary.

WHEREFORE, Movant respectfully moves this Court for an Order (i) granting Movant relief from the automatic stay to foreclose upon and to otherwise exercise and enforce its rights with respect to the Mortgaged Premises, (ii) awarding reasonable attorneys' fees incurred in the preparation and presentation of this motion, and (iii) granting all such other and further relief as the Court deems appropriate and necessary.

Respectfully submitted,

Dated:  06/08/2022

BY:  /s/ Lily C. Calkins

Christopher A. DeNardo 78447
Kristen D. Little 79992
Lily C. Calkins 327356
LOGS Legal Group LLP
3600 Horizon Drive, Suite 150
King of Prussia, PA 19406
(610) 278-6800
logsecf@logs.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: JOSEPH ZWICHAROWSKI<br>        Debtor, | BANKRUPTCY CASE NUMBER<br>17-11811-MDC |
| NATIONSTAR MORTGAGE LLC<br>        Movant.<br>v. | CHAPTER 13<br>11 U.S.C. § 362 |
| JOSEPH ZWICHAROWSKI<br>        Debtor/Respondent, | HEARING DATE AND TIME:<br>**July 5, 2022 at 10:30 A.M.** |
| KENNETH E. WEST, Trustee<br>        Additional Respondent. | COURTROOM # 2 |

## O R D E R

AND NOW, this _____ day of _____, 2022, at the Eastern District of Pennsylvania, upon the consideration of the Motion of Movant for Relief from the Automatic Stay (the "Motion"), and the failure of Debtor to file an answer, appear or otherwise respond to the Motion, and for good cause shown, it is

ORDERED AND DECREED that the Automatic Stay of all proceedings, as provided under Section 362 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "Code"), 11 U.S.C. § 362, is lifted to allow Movant, or its successors, if any, to proceed with its rights under its loan documents for the property located at 3982 Carteret Drive, Philadelphia, PA 19114; and it is

FURTHER ORDERED that Rule 4001(a)(3) is not applicable and Movant, or its successors, if any, may immediately implement this order.

BY THE COURT:

_____
HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: JOSEPH ZWICHAROWSKI<br>Debtor, | BANKRUPTCY CASE NUMBER<br>17-11811-MDC |
| NATIONSTAR MORTGAGE LLC<br>Movant.<br>v. | CHAPTER 13 |
| | 11 U.S.C. § 362 |
| JOSEPH ZWICHAROWSKI<br>Debtor/Respondent, | HEARING DATE AND TIME:<br>**July 5, 2022 at 10:30 A.M.** |
| KENNETH E. WEST, Trustee<br>Additional Respondent. | COURTROOM # 2 |

**CERTIFICATE OF SERVICE**

I, _____Lily C. Calkins_____, an employee of the law firm of LOGS Legal Group LLP hereby certify that I caused to be served true and correct copies of the Motion and Notice of Motion, Response Deadline and Hearing Date by First Class Mail, postage prepaid, at the respective last known address of each person set forth below on this 8th day of June 2022:

Joseph Zwicharowski
3982 Carteret Drive
Philadelphia, PA 19114

Brad J. Sadek, Esquire
1315 Walnut Street
Suite 502
Philadelphia, PA 19107
brad@sadeklaw.com - VIA ECF

Kenneth E. West, Trustee
P.O. Box 40837
Philadelphia, PA 19107
ecfemails@ph13trustee.com - VIA ECF

United States Trustee
Sent via electronic notification
ustpregion03.ph.ecf@usdoj.gov

I HEREBY CERTIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

/s/ Lily C. Calkins
_____

Christopher A. DeNardo 78447
Kristen D. Little 79992
Lily C. Calkins 327356
LOGS Legal Group LLP
3600 Horizon Drive, Suite 150
King of Prussia, PA 19406
(610) 278-6800
logsecf@logs.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: JOSEPH ZWICHAROWSKI<br>　　　　Debtor, | BANKRUPTCY CASE NUMBER<br>17-11811-MDC |
| NATIONSTAR MORTGAGE LLC<br>　　　　Movant.<br>v. | CHAPTER 13 |
| JOSEPH ZWICHAROWSKI<br>　　　　Debtor/Respondent, | |
| KENNETH E. WEST, Trustee<br>　　　　Additional Respondent. | |

### NOTICE OF MOTION, RESPONSE DEADLINE AND HEARING DATE

Nationstar Mortgage LLC has filed a Motion for Relief, with the Court for relief from the automatic stay.

1.    **Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult an attorney.)**

2.    If you do not want the court to grant the relief sought in the Motion or if you want the court to consider your views on the Motion, then on or before **June 27, 2022** you or your attorney file a response to the Motion.

(a)    **If you are required to file documents electronically by Local Bankruptcy Rule 5005-1**, you must file your response electronically.

(b)    **If you are not required to file electronically,** you must file your response at: United States Bankruptcy Court, Robert N.C. Nix, Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA 19107.

(c)    **If you mail your Response** to the bankruptcy clerk's office for filing, you must mail it early enough so that it will be received on or before the date stated above

(d)    On the same day that you file or mail your Response to the Motion, you must mail or deliver a copy of the Response to the Movant's attorney:
　　　　Christopher A. DeNardo 78447
　　　　Kristen D. Little 79992
　　　　Lily C. Calkins 327356
　　　　LOGS Legal Group LLP
　　　　3600 Horizon Drive

Suite 150
King of Prussia, PA 19406
Phone: (610) 278-6800
Fax: (847) 954-4809

3.      A hearing on the motion is scheduled to be held before the HONORABLE MAGDELINE D. COLEMAN on **July 5, 2022** at **10:30 A.M.** in **Courtroom # 2**, United States Bankruptcy Court, Robert N.C. Nix, Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA 19107.

4.      **If you do not file a response to the Motion,** the court may cancel the hearing and enter an Order granting the relief requested in the Motion.

5.      If a copy of the motion is not enclosed, a copy of the motion will be provided to you if you request a copy from the attorney named in paragraph 1(b).

6.      You may contact the Bankruptcy Clerk's office at (215) 408-2800 to find out whether the hearing has been canceled because no one filed a response.

Date: 06/08/2022

Copy

SEE "PREPAYMENT NOTE ADDENDUM" ATTACHED HERETO AND MADE A PART HEREOF. 

# NOTE

| JULY 26, 2007 | WARRINGTON | PENNSYLVANIA |
|---|---|---|
| [Date] | [City] | [State] |

3982 CARTERET DRIVE, PHILADELPHIA, PA 19114-
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 166,410.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is

PLAZA HOME MORTGAGE, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.175 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on SEPTEMBER, 2007 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on AUGUST 01, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at PLAZA HOME MORTGAGE, INC.

5090 SHOREHAM PLACE #206, SAN DIEGO, CA 92122 or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 1,241.42 .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.



Copy

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of        15     calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000       % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

Copy

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note , protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
JOSEPH ZWICHAROWSKI        -Borrower                                             -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                             -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                             -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                             -Borrower



LEHMAN BROTHERS BANK, FSB

PAY TO THE ORDER OF
WITHOUT RECOURSE:

HELEN CHANG, CLOSING MANAGER
PLAZA HOME MORTGAGE, INC

Pay To The Order Of
Lehman Brothers Holding Inc
Without Recourse
Lehman Brothers Bank, FSB
By: _____
E. Todd Whittemore
Vice President

PAY TO THE ORDER OF
_____
WITHOUT RECOURSE
LEHMAN BROTHERS HOLDINGS INC.
BY: _____
PAUL E. SVEEN
AUTHORIZED SIGNATORY

Copy

# PREPAYMENT NOTE ADDENDUM
### *(Multi-State)*

This Prepayment Note Addendum is made this 26th day of       JULY, 2007        and is incorporated into and shall be deemed to amend and supplement the Note of the same date (the "Note") made by the undersigned (the "Borrower") to evidence indebtedness to

PLAZA HOME MORTGAGE, INC.

(the "Lender"), which debt is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") of the same date and covering the property described in the Security Instrument and located at

3982 CARTERET DRIVE, PHILADELPHIA, PA 19114-

(the "Property").

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender covenant, and agree, that the provisions of the section of the Note entitled "BORROWER'S RIGHT TO PREPAY" are amended to read as follows:

Subject to the Prepayment penalty provided below, I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." A "Full Prepayment" is the prepayment of the entire unpaid Principal due under the Note. A payment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

If, within the  36  - month period beginning with the date I execute the Note (the "Penalty Period"), I make a Full Prepayment, or Partial Prepayment in any  TWELVE  ( 12 )-month period that exceeds 20 % of the original Principal loan amount, I will pay a Prepayment charge as consideration for the Note Holder's acceptance of such Prepayment. The Prepayment charge will equal the amount of interest that would accrue during a  SIX  ( 6 )-month period on the amount prepaid that exceeds 20 % of the original Principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of the Prepayment, unless otherwise prohibited by applicable law or regulation. No Prepayment charge will be assessed for any Prepayment occurring after the Penalty Period.

Notwithstanding the foregoing, in the event of a Full Prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first  0  month(s) of the term of the Note, no Prepayment penalty will be assessed. In that event, I agree to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

The Note Holder will apply all Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a Partial Prepayment, there will be no change in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

1/01

Copy

If my Note is an Adjustable Rate Note, Partial Prepayments may reduce the amount of my monthly payment after the first interest rate Change Date following the Partial Prepayment. However, any reduction due to my Partial Prepayment may be offset by an interest rate increase.

The Note Holder's failure to collect a Prepayment charge at the time a Prepayment is received shall not be deemed a waiver of such charge. Any Prepayment charge not collected at the time the Prepayment is received shall be payable on demand.

All other provisions of the Note are unchanged and remain in full force and effect.

## NOTICE TO BORROWER

Do not sign this Addendum before you read it. This Addendum provides for the payment of a Prepayment charge if you wish to repay the loan prior to the date provided for repayment in the Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED:

_____(Seal)          _____(Seal)
JOSEPH ZWICHAROWSKI          -Borrower                                    -Borrower


_____(Seal)          _____(Seal)
                              -Borrower                                    -Borrower


_____(Seal)          _____(Seal)
                              -Borrower                                    -Borrower


_____(Seal)          _____(Seal)
                              -Borrower                                    -Borrower

603B1  Multi-state Note Addendum                    Page 2 of 2                                        1/01

Copy

| | |
|---|---|
| eRecorded in Philadelphia, PA | Doc Id: 51747963 |
| 08/06/2007 10:01A | Receipt #: 625605 |
| Page: 1 of 19 | Rec Fee: $126.50 |
| Commissioner of Records | Doc Code: M |

Prepared By:
PLAZA HOME MORTGAGE, INC.

5090 SHOREHAM PLACE #206
SAN DIEGO, CA 92122

Return To:
PLAZA HOME MORTGAGE, INC.

5090 SHOREHAM PLACE #206
SAN DIEGO, CA  92122

Parcel Number: 661289037
Premises:  3982 CARTERET DRIVE, PHILADELPHIA, PA  19114·

─────────────────── [Space Above This Line For Recording Data] ───────────────────

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated      JULY 26, 2007
together with all Riders to this document.

(B) "Borrower" is
JOSEPH  ZWICHAROWSKI, A SINGLE MAN

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint MI 48501-2026, tel. (888) 679-MERS.

PENNSYLVANIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3039  1/01
V-6A(PA) (0508) 01                                              Page 1 of 10      LENDER SUPPORT SYSTEMS INC. MERS6APA NEW (05/06)

Copy

(D) "Lender" is
PLAZA HOME MORTGAGE, INC.

Lender is a CORPORATION
organized and existing under the laws of  CALIFORNIA
Lender's address is
5090 SHOREHAM PLACE #206, SAN DIEGO, CA 92122

(E) "Note" means the promissory note signed by Borrower and dated          JULY 26, 2007
The Note states that Borrower owes Lender
ONE HUNDRED SIXTY SIX THOUSAND FOUR HUNDRED TEN AND NO/100 X X X X X X X X

                                                                                              Dollars
(U.S. $ 166,410.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than      AUGUST 01, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider            ☐ 1-4 Family Rider
☐ Graduated Payment Rider    ☐ Planned Unit Development Rider  ☐ Biweekly Payment Rider
☐ Balloon Rider              ☐ Rate Improvement Rider       ☐ Second Home Rider
☒ Other(s) [specify] PREPAYMENT RIDER

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

V-6A(PA) (0508).01                         Page 2 of 16                        Form 3039  1/01

Copy

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the                COUNTY
[Type of Recording Jurisdiction] of            PHILADELPHIA            [Name of Recording Jurisdiction]:

SEE COMPLETE LEGAL DESCRIPTION DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

which currently has the address of            3982 CARTERET DRIVE            [Street]

PHILADELPHIA            [City] , Pennsylvania        19114-        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

V-6A(PA) (0508) 01                    Page 3 of 16                    Form 3039  1/01

Copy

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

V-6A(PA) (0508) 01                    Page 4 of 15                    Form 3039   1/01

Copy

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

V-6A(PA) (0508) 01                    Page 5 of 16                    Form 3039  1/01

Copy

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these Items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

V-6A(PA) (0508) 01                          Page 8 of 16                          Form 3039   1/01

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Copy

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be

dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to

Copy

have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or

V-6A(PA) (0506).01                                    Page 12 of 18                                    Form 3039   1/01

Copy

agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

23. Release. Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

25. Reinstatement Period. Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

26. Purchase Money Mortgage. If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

27. Interest Rate After Judgment. Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

V-6A(PA) (0509).01                          Page 14 of 16                          Form 3039   1/01

Copy

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____
-Witness

_____
-Witness

_____ (Seal)          _____ (Seal)
JOSEPH ZWIGNAROWSKI    -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
-Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
-Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
-Borrower                              -Borrower

V-6A(PA) (0504).01                     Page 15 of 15                     Form 3039   1/01

Copy

COMMONWEALTH OF PENNSYLVANIA, *phla*                    County ss:

On this, the *26th* day of *July 2007*                    , before me, the
undersigned officer, personally appeared
JOSEPH ZWICHAROWSKI

known to me (or
satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged that he/she/they executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SAMANTHA A. DICKERSON, Notary Public
Lower Southampton Twp., Bucks County
My Commission Expires October 28, 2007

_____
Title of Officer

**Certificate of Residence**
I,                                           , do hereby certify that
the correct address of the within-named Mortgagee is P.O. Box 2026, Flint, MI 48501-2026.

Witness my hand this *26th*            day of  *July, 2007*

_____
Agent of Mortgagee

V-6A(PA) (0508).01                    Page 16 of 16                    Form 3039   1/01

Copy

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected,
Situate in the 66th Ward of the City of Philadelphia, County of Philadelphia, and Commonwealth of Pennsylvania, bounded and described
according to a Survey and Plan of Property, made for Orleans Construction Co., by John Reilly, Surveyor and Regulator, 4th District, on
January 26, 1979, as follows, to wit: --

Beginning at a point on the Southwesterly side of Carteret Drive (54 feet wide), which point is at the distance of 146 feet, 7 ½ inches,
measured North 31 degrees, 40 minutes, 30 seconds West, along the said side of Carteret Drive, from a point of tangent, which point of
tangent is at the arc distance of 21 feet, 9 3/8 inches, measured along the arc of a curve, curving to the left, having a radius of 15 feet, 00
inches, from a point of curve on the Northwesterly side of Avner Lane (54 feet wide); thence extending from said beginning point, South
58 degrees, 19 minutes, 30 seconds West, a portion of the distance through the center of the party wall of this premises, and premises
adjoining to the Southeast, the distance of 136 feet, 7 5/8 inches, to a point; thence extending North 34 degrees, 29 minutes, 08 seconds
West, the distance of 17 feet, 11 7/8 inches, to a point; thence extending North 58 degrees, 19 minutes, 30 seconds East, a portion of the
distance through the center of the party wall of this premises, and premises adjoining to the Northwest, the distance of 137 feet, 6 1/8
inches, to a point on the Southwesterly side of Carteret Drive, aforesaid; thence extending along said side of Carteret Drive, South 31
degrees, 40 minutes, 30 seconds East, the distance of 17 feet, 11 ½ inches, to the first mentioned point and place of the beginning.

BEING NO. 3982 CARTERET DRIVE

Copy

# PREPAYMENT RIDER
### (Multi-state)

This Prepayment Rider is made this 26th day of          JULY, 2007          and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to
PLAZA HOME MORTGAGE, INC.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at
3982 CARTERET DRIVE, PHILADELPHIA, PA 19114-
(the "Property").

Additional Covenants. Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." A "full prepayment" is the prepayment of the entire unpaid principal due under the Note. A payment of only part of the unpaid principal is known as a "partial prepayment."

If, within the   36   -month period beginning with the date Borrower executes the Note (the "Penalty Period"), Borrower makes a full prepayment, or partial prepayment in any          TWELVE          ( 12 )-month period that exceeds 20 % of the original principal loan amount, Borrower will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during   SIX   ( 6 )-month period on the amount prepaid that exceeds 20 % of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of the prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first   0   month(s) of the term of the Note, no prepayment penalty will be assessed. In that event, Borrower agrees to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

Copy

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____ (Seal)        _____ (Seal)
JEFERY ZWIERZAKOWSKI      -Borrower                                          -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                                          -Borrower

60382 Multi-State Rider                                Page 2 of 2

When Recorded Return To:
DOCUMENT ADMINISTRATION
Nationstar Mortgage
8950 CYPRESS WATERS BLVD
COPPELL, TX  75019

**Assessor's/Tax ID No. 661289037**

---

### CORPORATE ASSIGNMENT OF MORTGAGE

**Philadelphia, Pennsylvania**
**SELLER'S SERVICING #:**

████████████████████████

Date of Assignment: March 30th, 2017

Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR PLAZA HOME MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS
Assignee: NATIONSTAR MORTGAGE LLC

I hereby certify the precise address of the within named Assignor is P.O. BOX 2026, FLINT, MI 48501-2026.

I hereby certify the precise address of the within named Assignee is 8950 CYPRESS WATERS BLVD., COPPELL, TX  75019.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC has a physical address at 1901 E Voorhees Street, Suite C, Danville, IL 61834 and a mailing address at P.O. BOX 2026, FLINT, MI 48501-2026

Executed By: JOSEPH ZWICHAROWSKI, A SINGLE MAN  To: MORTGAGE ELECTRONIC REGISTRATIONS SYSTEMS, INC., AS NOMINEE FOR PLAZA HOME MORTGAGE, INC.
Date of Mortgage:  07/26/2007 Recorded:  08/06/2007  as Instrument/Document: 51747963  In the County of Philadelphia, State of Pennsylvania.
Property Address: 3982 CARTERET DRIVE, PHILADELPHIA, PA  19114 in the City of Philadelphia
Legal:  See Exhibit "A" Attached Hereto And By This Reference Made A Part Hereof

I do certify that the precise address of NATIONSTAR MORTGAGE LLC is 8950 CYPRESS WATERS BLVD., COPPELL, TX  75019
Attested By:

_____
                    Mohamed Hameed

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $166,410.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR PLAZA HOME MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS
On March 30th, 2017

By:_____
MOHAMED HAMEED, Assistant
Secretary


STATE OF Texas
COUNTY OF Dallas

On March 30th, 2017, before me, COLLEEN BARNETT, a Notary Public in and for Dallas in the State of Texas, personally appeared MOHAMED HAMEED, Assistant Secretary of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR PLAZA HOME MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS, personally known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

COLLEEN BARNETT
Notary Expires: 11/30/2019 #130453613

COLLEEN BARNETT
Notary Public, State of Texas
Comm. Expires 11-30-2019
Notary ID 130453613

(This area for notarial seal)

## LEGAL DESCRIPTION

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected, situate in the 66th Ward of the City of Philadelphia, County of Philadelphia, and Commonwealth of Pennsylvania, bounded and described according to a Survey and Plan of Property, made for Orleans Construction Co., by Jon Reilly, Surveyor and Regulator, 4th District, on January 26, 1979, as follows, to wit:

BEGINNING at a point on the Southwesterly side of Carteret Drive (54 feet wide), which point is at the distance of 146 feet, 7 ½ inches, measured North 31 degrees, 40 minutes, 30 seconds West, along the said Carteret Drive, from a point of tangent, which point of tangent is at the arc distance of 21 feet, 9 3/8 inches, measures along the arc of a curve, curving to the left, having a radius of 15 feet, 00 inches, from a point of curve on the Northwesterly side of Avner Lane (54 feet wide); thence extending from said beginning point, South 58 degrees, 19 minutes, 30 seconds West, a portion of the distance through the center of the party wall of this premises, and premises adjoining to the Southeast, the distance of 136 feet, 7 5/8 inches, to a point; thence extending North 58 degrees, 19 minutes, 30 seconds East, a portion of the distance through the center of the party wall of this premises, and premises adjoining to the Northwest, the distance of 137 feet, 6 1/8 inches, to a point on the Southwesterly side of Carteret Drive, aforesaid; thence extending along said side of Carteret Drive, South 31 degrees, 40 minutes, 30 seconds East, the distance of 17 feet, 11 ½ inches, to the first mentioned point and place of the BEGINNING.

BEING No. 3982 Carteret Drive

Copy

Loan Number ▮▮▮▮▮▮

## LOAN MODIFICATION AGREEMENT
### (Providing for Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), effective on **1ST DAY OF MAY, 2021**, between **JOSEPH ZWICHAROWSKI** ("Borrower"), and **NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER** ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") dated **JULY 26, 2007** and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in and secured by the Security Instrument and defined therein as the "Property", located at

### 3982 CARTERET DR, PHILADELPHIA, PENNSYLVANIA 19114
(Property Address)

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. As of **MAY 01, 2021**, the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. **$145,358.72**, consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2. Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest will be charged on the Unpaid Principal Balance at the yearly rate of **3.6250%** from **APRIL 01, 2021**. Borrower promises to make monthly payments of principal and interest of U.S. **$574.06**, beginning on the **1ST DAY OF MAY, 2021**, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. The yearly rate of **3.6250%** will remain in effect until principal and interest are paid in full. If on **APRIL 01, 2061**, (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

3. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

4. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:

LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT          Form 3179   1/01
(rev. 4/14)
▮▮▮▮▮

Version  04_02_2021_15_00_13                                                          (page 1 of 7)

Copy

Loan Number ▮▮▮▮▮▮▮

(a)  all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note; and

(b)  all terms and provisions of any adjustable rate rider, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

5.  Borrower understands and agrees that:

(a)  All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

(b)  All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c)  Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d)  If permitted by applicable law, all costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

(e)  Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

(f)  Borrower authorizes Lender, and Lender's successors and assigns, to share Borrower's information including, but not limited to (i) name, address, and telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, (v) payment history, (vi) account balances and activity, including information about any modification or foreclosure relief programs, with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative, or otherwise provide support services related to Borrower's loan. For purposes of this section, Third Parties include a counseling agency, state or local Housing Finance Agency or similar entity, any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with Borrower's loan.

LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179    1/01
(rev. 4/14)
▮▮▮▮▮
Version 04_02_2021_15_00_13                                            (page 2 of 7)

Copy

**Loan Number** ▮▮▮▮▮▮▮

Borrower consents to being contacted by Lender or Third Parties concerning mortgage assistance relating to Borrower's loan including the trial period plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Third Parties.

☐ By checking this box, Borrower also consents to being contacted by text messaging.

(g)     Borrower hereby absolutely and unconditionally assigns and transfers to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon this assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold estate.

Borrower hereby absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default under this Agreement, pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that

LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT          Form 3179  1/01
(rev. 4/14)
▮▮▮▮▮▮
Version 04_02_2021_15_00_13                                                        (page 3 of 7)

Copy

**Loan Number** ███████

would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

(h)  In any foreclosure action dismissed as a result of entering into this Agreement, Borrower will remain liable for and bear his or her own attorney fees and costs incurred in connection with such action, if permitted by applicable law.

(i)  The mortgage insurance premiums on Borrower's Loan may increase and the date on which Borrower may request cancellation of mortgage insurance may change as a result of the loan modification.

(j)  Any Borrower who co-signed the Security Instrument but did not execute the Note (a "Co-signer") and has not assumed the debt: (a) is co-signing this Agreement only to acknowledge the Agreement; (b) is not personally obligated to pay the sums secured by the Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of the Security Instrument or the Note without the Co-signer's consent.

6.  If Borrower is a Debtor in an active bankruptcy proceeding, Court and/or Bankruptcy Trustee approval of this modification agreement may be required depending upon jurisdictional requirements. If Court and/or Bankruptcy Trustee approval of the modification is required, the modification agreement will not be effective unless evidence of the required approval is provided.

7.  Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan

LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT          Form 3179   1/01
(rev. 4/14)
███████

Copy

Loan Number ▮▮▮▮▮▮

Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

(SIGNATURES CONTINUE ON FOLLOWING PAGES)

Copy

**Loan Number** ▮▮▮▮▮▮

In Witness Whereof, the Borrower(s) have executed this agreement.

_____     Date: 4/13/2021

Borrower - **JOSEPH ZWICHAROWSKI**

**LOAN MODIFICATION AGREEMENT**—Single Family—Fannie Mae UNIFORM INSTRUMENT     Form 3179    1/01
(rev. 4/14)

**Version  04_02_2021_15_00_13**                                                      *(page 6 of 7)*

Copy

**Loan Number** ████

In Witness Whereof, the Lender has executed this Agreement.

Lender

**NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER**

By: _____

Printed Name: 

Denise Myers
Vice President

Title: _____

Date: 4/22/2021

**LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT**     Form 3179    1/01
**(rev. 4/14)**

**Version  04_02_2021_15_00_13**                                                  *(page 7 of 7)*

Copy

# DOCUMENT CORRECTION AGREEMENT
("Agreement")

Loan Number: ▮▮▮▮▮ (the "Loan")

**AGREEMENT TO CORRECT MISSTATED DOCUMENTS AND TO PROVIDE ADDITIONAL DOCUMENTATION**: In consideration of NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER providing the loan modification (the "Workout") as requested by the undersigned ("Borrower"), and regardless of the reason for any loss, misplacement, or inaccuracy in any of the enclosed documents, Borrower agrees as follows: If any document is lost, misplaced, misstated or inaccurately reflects the true and correct terms and conditions of the Workout, upon request of NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER, the Borrower will comply with any request to execute, acknowledge, and deliver to NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER any documentation ("Replacement Documents") NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s). The Borrower agrees to deliver the Replacement Documents within ten (10) days after receipt by the Borrower of a written request for such replacement.

**REQUEST BY NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER**:  Any request under this Agreement made by NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER, (including assignees and persons acting on behalf of NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER), shall be prima facie evidence of the necessity for the same. A written statement addressed to the Borrower, first class postage prepaid, at the mailing address indicated in our records shall be considered conclusive evidence of receipt by the Borrower of the request for Replacement Documents.

**BORROWER LIABILITY**: If the Borrower fails or refuses to execute, acknowledge, and deliver the Replacement Documents to NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER more than ten (10) days after being requested to do so by NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER, the Borrower shall be liable for any and all loss or damage which NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER reasonably sustains thereby, including, but not limited to, all reasonable attorneys' fees and costs incurred by NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER. In addition, NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER may elect to declare the Workout null and void in which case the loan shall be payable at the rate and on the terms as existed prior to the Workout. Any funds received by NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER in conjunction with the Workout shall be retained by NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER and applied to the loan as determined by NATIONSTAR MORTGAGE LLC D/B/A MR. COOPER in its discretion.

_Joml Zml_                                          Date: _4 /13, 2021_
JOSEPH ZWICHAROWSKI